In the United States District Court
for the District of Kansas

_____

Case No. 21-cv-02525-TC

_____

DENISE WILDERSON,

*Plaintiff*

v.

UNIVERSITY OF KANSAS HOSPITAL AUTHORITY,

*Defendant*

_____

## MEMORANDUM AND ORDER

Plaintiff Denise Wilderson is a former employee of Defendant University of Kansas Hospital Authority (UKHA). Wilderson alleges that UKHA terminated her in violation of federal law because of her age and retaliated against her for engaging in protected activity. Doc. 47 at ¶ 4.a.i.–vi. UKHA moves for summary judgment on all claims. Doc. 48. For the following reasons, that motion is granted.

## I

## A

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "'material' if it might affect the outcome of the suit under the governing law." *Janny v. Gamez*, 8 F.4th 883, 898–99 (10th Cir. 2021) (quoting *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997)). And disputes over material facts are "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 899 (quoting *Allen*, 119 F.3d at 839). Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote.

At this stage, the parties must identify material facts by reference to "pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits, if any." *Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1173 (10th Cir. 2020) (citation and internal quotation marks omitted); *see also* D. Kan. R. 56.1(d). The court "construe[s] the factual record and reasonable inferences therefrom in the light most favorable to the nonmovant." *Janny*, 8 F.4th at 899 (quoting *Allen*, 119 F.3d at 839–40). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *id.*, or unsupported by the record as a whole, *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Heard v. Dulayev*, 29 F.4th 1195, 1202 (10th Cir. 2022).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues as to those dispositive matters remain for trial. *Celotex*, 477 U.S. at 324; *Savant Homes*, 809 F.3d at 1137.

**B**

**1.** UKHA hired Denise Wilderson in 2001 as a cancer treatment nurse. Doc. 53 at ¶¶ 3, 4; Doc. 47 at ¶ 2.a.i. Wilderson "transferred to the position of Clinical Nurse Coordinator in the Melanoma Clinic run by Dr. Gary Doolittle" in 2012. Doc. 53 at ¶ 4; Doc. 47 at ¶ 2.a.v. That clinic consisted of Doolittle, Kristen Burkett (a nurse practitioner), two Clinical Nurse Coordinators, and a pharmacist. Doc. 53 at ¶ 6. Burkett joined the team three years after Wilderson. *Id.* at ¶ 7; Doc. 47 at ¶ 2.a.vi. At the relevant time, Mary Williams was the Nursing Supervisor and Amy Belton was the Nurse Manager. *Id.* at ¶ 8.

Wilderson's performance at UKHA was checkered. She received verbal counseling in 2011 for frequently leaving the clinic during her shift without notifying staff of her whereabouts, Doc. 53 at ¶ 10; Doc. 49-2 at 57–58, and a written warning in 2012 for being unavailable on multiple occasions, Doc. 53 at ¶ 10; Doc. 49-2 at 59–60. She received a written warning in 2017 for a confrontation with a scheduler, who perceived Wilderson's conduct as "accusatory," "disrespectful," and "retaliatory." Doc. 53 at ¶ 11; Doc. 49-2 at 61–62. Wilderson also received counseling in June 2019 for accessing and printing protected health information and a "Final Written Warning" three months later for falsifying a medical records request. Doc. 53 at ¶ 20; Doc. 49-2 at 73–76.

2

**2.** On June 11, 2020, Wilderson and the nurse she was training, Brittni Ridenour left the clinic together for lunch, leaving a gap in coverage at the clinic. Doc. 47 at ¶ 2.a.viii.; Doc. 53 at ¶¶ 41, 44. Before they left, Wilderson informed Burkett, but not the float nurse, that they were leaving. Doc. 53 at ¶¶ 42, 48. Wilderson "mentioned to Ridenour that she thought Burkett was going to be mad." *Id.* at ¶ 43.

When they returned, Burkett asked them both to stagger their lunches going forward because she had "realized that she needed to have someone there with her." Doc. 53 at ¶ 44. Ridenour agreed to the request, but Wilderson objected because she felt that UKHA was failing to abide by its policy to ensure breaks and lunches. *Id.* at ¶¶ 45, 46. Burkett and Ridenour described Wilderson's response to the request as "argumentative, aggressive, explosive, and [as] having a meltdown." *Id.* at ¶¶ 49, 50.

Due to Wilderson's response, Burkett submitted a report documenting the event in which she described feeling "left without assistance of any kind" and that "this [wa]s a reoccurring issue with [Wilderson]." Doc. 53 at ¶¶ 51, 52; Doc. 49-4 at 18–19. The following day, Williams, Belton, Doolittle, Burkett, and Wilderson met to discuss the events and concluded "that the team was not going to be able to continue functioning in the capacity it was in" due to "multiple issues . . . over a period of years." Doc. 53 at ¶¶ 53, 57.

The June 11 event triggered the involvement of UKHA's Human Resources staff. Chris Wilson started an investigation into Wilderson's conduct based on Burkett's concerns. Doc. 53 ¶ 58; Doc. 49-9 at 3. Burkett told Wilson that, in addition to the controversy over breaks and lunches, Wilderson had repeatedly failed to follow oral refill chemotherapy protocols. Doc. 49-9 at 3. Those protocols dictate that a Nurse Coordinator must both call the patient and check lab results before he or she sends an oral chemotherapy medication to a provider for a refill "to ensure that the prescription should be refilled." Doc. 53 at ¶¶ 60, 61. Burkett asserted that Wilderson failed to follow those protocols on several occasions. *Id.*; Doc. 49-9 at 10. Taylor Monson, a Clinical Pharmacist, confirmed Burkett's concerns regarding the chemotherapy protocols. Doc. 53 at ¶ 62; Doc. 49-9 at 4.

Wilderson and Ridenour were spotted leaving the clinic on two occasions shortly thereafter. On June 18, Williams saw Wilderson and Ridenour leaving the clinic area together and relayed this to Belton. Doc. 53 at ¶¶ 63, 64. A few weeks later, Wilderson asked Ridenour to accompany her to pick up lunch. Doc. 53 at ¶ 65. Wilderson checked out of the clinic and believed that Burkett was aware of her departure.

*Id.* at ¶ 66; Doc. 49-2 at 34. Wilderson thought it was okay to leave because Doolittle was not seeing any patients at that time. Doc. 49-2 at 33. Frustrated by Wilderson's absence, Burkett contacted her own supervisor, Gloria Solis, and Solis relayed Burkett's account to Belton, Wilson, and Lori Rodgers, Director of Nursing. Doc. 53 at ¶ 72. Belton met with Wilderson and Ridenour the following day to discuss the incident, which Ridenour understood to constitute verbal counseling. *Id.* at ¶ 73–74.

Following that meeting, Burkett submitted two new reports regarding Wilderson's behavior. Doc. 53 at ¶ 78. The first concerned the most recent lunch incident, in which Burkett indicated that "nothing was communicated with [her] prior to them leaving" and she was left seeing patients "without assistance." *Id.* at ¶ 69; Doc. 49-4 at 22–23. The second detailed her opinion that she had relayed to HR about Wilderson's failure to follow the protocols for oral chemotherapy refills. Doc. 53 at ¶¶ 78–80.

   **3.** UKHA terminated Wilderson's employment on July 13, 2020. Doc. 47 at ¶ 2.a.ii.; Doc. 49-2 at 80. At the time of her termination, Wilderson was 51 years old. Doc. 53 at 38. The termination letter cited the three instances when Wilderson left the clinic as well as her "outburst[s]" toward clinic staff, inadequate patient coverage during working hours, and insubordination. Doc. 49-2 at 78–79. The letter also identified Wilderson's failure to follow oral chemotherapy protocols, which was tied to "at least 3 oral chemo patient safety events or near miss events." *Id.* at 79. The most recent of those events was issuing a request to refill a patient's chemotherapy medication after the course had completed, a drug which if taken when no longer needed "could lead to poor outcomes or even death." *Id.* Among the decisionmakers were Belton, Williams, and Rodgers as nurse management staff, and Wilson in Human Resources. Doc. 53 at ¶ 83.

   Wilderson disagreed with UKHA's termination decision. She claimed that she was not given lunch breaks and that "a handoff was given each time" before she left. Doc. 49-2 at 80. She also noted that the termination was unfair and "completely personal in all aspects," and that her dedication of more than 20 years to UKHA was "not valued." *Id.*

   Wilderson appealed her termination through UKHA's three-step grievance process. Doc. 53 at ¶¶ 88, 91. In that process, an employee first submits a grievance to his or her supervisor, who issues a response. *Id.* at ¶ 91. Second, the employee may elevate the grievance to the department director, who then responds. *Id.* Third, if the employee

remains dissatisfied with the responses to the grievance, he or she may appeal to a three-person advisory body of fellow employees empaneled by human resources. *Id.* That panel considers the grievance, hears from the employee and management, and issues findings and recommendations to the Vice President of Human Resources, who renders a final decision. *Id.*

At step one, Wilderson submitted her grievance to Belton. Doc. 53 at ¶ 91, 95; Doc. 49-2 at 90–91. In her grievance, Wilderson defended her conduct and made allegations of age discrimination. Specifically, she stated that the disputes regarding lunch breaks arose after she was notified that she "had 'topped out' in salary eligibility." Doc. 49-2 at 84. She further stated that the nature of the process and her termination "reinforce[d] a hostile work environment that disfavor[ed] older employees" and that the "oncology center became a toxic and hostile work environment . . . particularly after the departures of multiple clinic nurse coordinators over the age of 50." *Id.* at 88. Wilderson further asserted that younger nurses who engaged in "similar conduct" were not subject to "similar disciplinary actions." *Id.* at 87.

Belton disagreed. She stated that from the time of Wilderson's Final Written Warning in September 2019 until her termination, her performance had not met expectations despite "several coaching attempts." Doc. 49-2 at 90. Wilderson had "displayed a lack of engagement to make necessary improvements, an inability to self-reflect and take ownership, an inability to exhibit proper time management skills and an inability to effectively communicate and build rapport and trust with [her] team." *Id.*; Doc. 53 at ¶ 95. Belton detailed the policy regarding rest and meal breaks and noted that, despite "multiple conversations," Wilderson had repeatedly "left a provider and patients in clinic alone." Doc. 49-2 at 90. Furthermore, Wilderson's response to Burkett on June 11 "was perceived by multiple parties as defensive, aggressive, and disrespectful," and her behavior was "disruptive," "decrease[d] staff morale," and "undermine[d] collaborative relationships essential to quality patient care." *Id.* at 91. Belton concluded that Wilderson had not provided her with information that would cause her to rescind the termination decision, which was administered in compliance with UKHA guidelines. *Id.*

At step two, Wilderson presented her grievance to the department director, Rodgers. Doc. 53 at ¶¶ 91, 98; Doc. 49-7 at 27–29. Rodgers interviewed Wilderson, Ridenour, and two Clinical Pharmacists, and reviewed Wilson's interview notes as well as Burkett's report regarding refill protocols. Doc. 53 at ¶ 99. Rodgers responded that Burkett was without nursing support in the clinic during the first lunch event. Doc.

53 at ¶ 100; Doc. 49-7 at 27. Rodgers found that Wilderson responded to Burkett's request to stagger in an "unprofessional, uncooperative, and completely disrespectful" manner. Doc. 49-7 at 27. Rodgers also noted that Wilderson was "upset and worried" at the meeting to address the June 11 lunch event because she knew she was on a Final Written Warning. Doc. 49-7 at 27. Rodgers confirmed the other departure events and detailed Ridenour's negative experience with Wilderson as a trainee, including Wilderson's use of an "aggressive tone" with pharmacists, patients, and family members as well as failing to provide Ridenour with necessary training materials. *Id.* at 28. Ridenour also described to Rodgers that Wilderson supported Doolittle much more than Burkett. *Id.* According to Ridenour, Doolittle's requests to Wilderson were met with a "positive and willing response" while Burkett's were "deflected to another team member to handle or not followed up on at all." *Id.* Doolittle's testimony confirms this unequal treatment—Wilderson was "providing a different level of support" to him than she was to Burkett. Doc. 49-3 at 11. Rodgers also provided a review of peer feedback on Wilderson's performance, which described the clinic as "tense" when Wilderson was present. Doc. 49-7 at 27–28. Rodgers upheld Wilderson's termination. *Id.* at 28; Doc. 53 at ¶ 101.

At step three, Wilderson elevated her grievance to a panel of three of her peers, who considered the grievance and heard directly from Wilderson and management. Doc. 53 at ¶¶ 91, 105. Doc. 49-2 at 93, 95; Doc. 49-7 at 30. The group determined that Wilderson had "not been unjustly held accountable" as she did "not take ownership for her actions," "consistently did not follow protocol" regarding "chemo medications" and "meal breaks," and "was in denial" and "did not appear remorseful" about potential harm to a patient. Doc. 53 at ¶ 107; Doc. 49-2 at 95; Doc. 49-7 at 30. The group also determined that Wilderson had not provided additional information which would support overturning the decision. Doc. 53 at ¶ 107; Doc. 49-2 at 95; Doc. 49-7 at 30. As a result, the Vice President of Human Resources, Jon Joffe, rendered a final decision upholding the termination. Doc. 53 at ¶ 109; Doc. 49-2 at 96. Three days after conclusion of the grievance process, UKHA hired Colleen Squires, then aged 52 years, as a Clinical Nurse Coordinator, filling Wilderson's old position in the clinic. Doc. 53 at ¶ 113; Doc. 57 at 10.

## C

Wilderson filed a charge with the Equal Employment Opportunity Commission on December 16, 2020, alleging discrimination on the basis of age as well as unlawful retaliation. Doc. 47 at 5. The EEOC

issued Wilderson a right-to-sue notice on August 12, 2021, and Wilderson filed this case within the required 90-day window. *Id.*

Wilderson presses two types of claims in this lawsuit. First, she claims that UKHA discriminated against her because of her age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.* Doc. 47 at ¶ 4.a.i. She contends that UKHA violated the ADEA through widespread hostility to older nurses, by disciplining her inconsistently as compared with younger nurses, and by replacing her with an employee in her thirties. *Id.* at ¶ 3.a. Second, Wilderson claims that UKHA retaliated against her by finalizing her termination after she made it aware of age discrimination and by instructing UKHA employees not to communicate with her following her termination. *Id.*

UKHA moves for summary judgment on both claims. Doc. 48. UKHA argues that Wilderson "cannot demonstrate a prima facie case of age discrimination or retaliation under the ADEA, and even if she could, [Wilderson] cannot establish UKHA's decisions" regarding her termination were pretextual. Doc. 49 at 2. UKHA's motion has been fully briefed and is ripe for resolution.

## II

UKHA is entitled to summary judgment on all claims. Wilderson has failed to establish a prima facie case of either age discrimination or retaliation. And, in any event, UKHA offers legitimate, non-discriminatory business reasons for terminating Wilderson, and Wilderson has not demonstrated a genuine dispute of material fact that UKHA's reasons for terminating her were pretextual.

## A

Wilderson contends that she was terminated on the basis of her age in violation of the ADEA. Doc. 47 at ¶ 4.a.i. UKHA argues that Wilderson does not present a prima facie case because she was not performing satisfactory work and, in any event, was not replaced by a younger person. Doc. 49 at 23–26. Wilderson fails to raise a genuine factual dispute over her prima facie case.

An ADEA claim based on circumstantial evidence proceeds through the *McDonnell Douglas* framework. *DePaula v. Easter Seals El*

*Mirador*, 859 F.3d 957, 968–69 (10th Cir. 2017).[1] Under that framework, a plaintiff bears the initial burden of establishing a prima facie case of unlawful discrimination. *Id.* at 969. If he or she does so, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for taking its adverse action. *Id.* at 970. If the defendant satisfies its burden, the burden shifts back to the plaintiff to prove that the defendant's proffered reasons were pretextual—*i.e.*, "not the true reason for the employment decision." *Id.*

A plaintiff's prima facie case for age discrimination on the basis of termination must show that he or she was "within the protected class of individuals 40 or older," "performing satisfactory work," "terminated from employment," and "replaced by a younger person, although not necessarily one less than 40 years old." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1056 (10th Cir. 2020) (citation omitted).[2] The evidence underlying the prima facie case must be "adequate to create an inference that the adverse employment decision was, in fact, motivated by plaintiff's age." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008).

**1.** UKHA does not dispute that Wilderson was a member of the protected class and that she suffered adverse employment action. Doc. 49 at 23. Instead, it contends that Wilderson cannot establish a prima facie case for age discrimination because she has not demonstrated that

---

[1] It appears that the parties agree that there is no direct evidence of discrimination and that all of the evidence is circumstantial because they jointly analyze Wilderson's claims under the *McDonnell Douglas* test. *See* Doc. 49 at 22; Doc. 53 at 37.

[2] Wilderson seeks a slightly different formulation of the prima facie test that, in essence, seems to more closely reflect her assertion that she is alleging UKHA engaged in a pattern or practice of systemically terminating older nurses. Doc. 53 at 37. (quoting *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012)). That request is denied. For one thing, the iteration described in *Frappied* accurately states the elements of the claim Wilderson is asserting. For another, Wilderson has not preserved a pattern-or-practice claim. Doc. 47 at ¶ 3.a.; *Murphy-Sims v. Owners Ins. Co.*, 947 F.3d 628, 630 (10th Cir. 2020) ("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived . . . ."). And even if she had, it would fail because individual employees may not bring pattern-or-practice claims. *Daniels*, 701 F.3d at 632–33; *Roberts v. Tim Dahle Imports*, Inc., 606 F. Supp. 3d 1133, 1136 (D. Utah 2022); *see also Equal Emp. Opportunity Comm'n v. TriCore Reference Lab'ys*, 849 F.3d 929, 939 (10th Cir. 2017) (noting the difference between a pattern-or-practice claim and an individual claim).

she was performing satisfactory work or that she was replaced by a younger person. *Id.* at 23–26. While Wilderson has raised a genuine dispute concerning her satisfactory performance, she has not established a genuine dispute because her replacement was older than her.

Wilderson has raised a genuine dispute that she was performing satisfactory work. *Contra* Doc. 49 at 24–25. At the prima facie stage, Wilderson need only "introduc[e] some evidence of good performance." *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1420 (10th Cir. 1991). Wilderson had several documented performance issues, and deposition testimony of fellow employees suggests that her behavior towards clinic staff negatively impacted the clinic's function. *See, e.g.*, Doc. 49-3 at 11. Despite this, she has produced evidence that she was nominated for an "Excellence in Oncology Nursing Award for Oncology" award in 2019, Doc. 53 at ¶ 117, and that a coworker considered her to be an excellent nurse, Doc. 53-6. That is sufficient to create a genuine factual dispute as to whether her work was satisfactory for purposes of the prima facie case. *Denison*, 941 F.2d at 1420 (recognizing the burden at the prima facie case is low given the structural work done by the shifting burdens of the *McDonnell Douglas* framework).

But there is no genuine dispute that UKHA replaced Wilderson with an older—not younger—employee. Doc. 49 at 25. Wilderson, aged 51 years at the time of her termination, Doc. 53 at 38, was replaced by Colleen Squires, who was 52 years old when she was hired, Doc. 49 at 25; Doc. 57 at 10. Wilderson seems to argue that she was replaced by a younger nurse, Brittni Ridenour. Doc. 53 at 39. But that argument directly contradicts her admission that Squires was hired to replace her. Doc. 53 at ¶ 113. The uncontroverted evidence demonstrates that she was replaced by an older employee. Thus, Wilderson's prima facie case for age discrimination must fail. *Adamson*, 514 F.3d at 1146 (affirming the district court's grant of summary judgment in favor of the employer for failure to establish a prima facie case where the employee was replaced by someone older).

**2.** Even assuming that Wilderson could establish a prima facie case of age discrimination, her claim fails. Specifically, UKHA has adequately asserted a legitimate, non-discriminatory reason for its termination and Wilderson has no evidence to support an inference of pretext.

**a.** When a plaintiff satisfies the prima facie elements, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for its termination decision. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1193 (10th Cir. 2018). The burden to establish a legitimate,

9

nondiscriminatory reason is "exceedingly light." *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1215 (10th Cir. 2022) (citation omitted); *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 968–69 (10th Cir. 2017). On a motion for summary judgment, a defendant need only "'articulate a reason for the [action] that is not, on its face, prohibited' and that is 'reasonably specific and clear.'" *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (citation omitted). It "need not persuade the court that it was actually motivated by the proffered reasons." *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

UKHA has satisfied that standard. It asserts that it terminated Wilderson "based upon a history of insubordinate and related conduct." Doc. 47 at 5–7. "Poor performance is a quintessentially legitimate and nondiscriminatory reason for termination." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005). And UKHA's claim is supported by the Corrective Action Form terminating Wilderson's employment. Doc. 49-2. That reason is not facially discriminatory, and it identifies reasonably specific business reasons for taking the action. *See Frappied*, 966 F.3d at 1058.

**b.** An employer's satisfaction of its obligation to identify a lawful reason for the termination returns the burden to the employee to show that the reason for his or her termination is pretext for discrimination. *See Lincoln*, 900 F.3d at 1193. A plaintiff "may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." *Id.* (quoting *DePaula*, 859 F.3d at 970). In other words, a plaintiff may show that the defendant's reason is "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [it is] unworthy of belief." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1039 (10th Cir. 2011); *see also Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019).

Pretext probes the true intentions of the defendant, so the focus is limited to "whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007). A court's role "is to prevent intentional discriminatory . . . practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Dewitt v. S.W. Bell Tele. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (quoting *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006)). All facts are examined "as they appear to the person making the decision, not as they appear to [the] plaintiff." *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 655 (10th Cir. 2013) (citation and internal quotation marks omitted). All doubts concerning

pretext are resolved in the plaintiff's favor, but conjecture and bare allegations are not enough to show pretext. *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007).

Wilderson offers four primary arguments for why UKHA's justifications are pretextual. Doc. 53 at 39. She points to the timeline between reaching her salary cap and termination, that her termination came a month after Burkett gave UKHA "an ultimatum" between her and Wilderson, that a younger employee replaced Wilderson and was not disciplined for the same conduct, and that older UKHA employees "live in fear" of being terminated. Doc. 53 at 39. But none of those arguments—either individually or collectively—suggests that UKHA's reasons for firing her are mere pretexts.

Wilderson contends that she was fired within a year of reaching her top salary range and that this "exceedingly suspicious timeline" is evidence of pretext. Doc. 53 at 38–39. But in fact, Wilderson reached the top of her salary range in September 2018 and was terminated more than a year and a half later, in July 2020. Doc. 53-1 at 5; Doc. 57-3 at 12. Wilderson cites no authority for the position that an eighteen-month gap creates an inference of pretext. Doc. 53 at 38–39. Typically, a much shorter period of time is necessary to infer pretext. *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1288 (10th Cir. 2022) (observing that temporal proximity of one month while constituting circumstantial evidence of pretext cannot, without more, demonstrate pretext). The attenuated timing fails to suggest any pretext given the ongoing disciplinary action: Wilderson proceeded through the corrective action steps over a three-year period—from written warning in January 2017, Doc. 49-2 at 61, to final written warning in September 2019, *id.* at 73, and termination in July 2020, *id.* at 78. This timeline does nothing to show that UKHA's reason is "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [it is] unworthy of belief." *EEOC*, 644 F.3d at 1039.

Wilderson next argues that Burkett's "ultimatum" demonstrates pretext. Doc. 53 at 39. Wilderson contends that, at the meeting following the first lunch event, Burkett told UKHA that it had to choose between keeping either her or Wilderson. *Id.* at 33, 39. To show UKHA's proffered reason for terminating here was merely pretextual, it is Wilderson's burden at this point to identify evidence suggesting that UKHA's reason for her termination is unbelievable in light of Burkett's ultimatum. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). But Wilderson has not done so—she merely speculates how Burkett's ultimatum might have affected her termination. *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1083 (10th Cir. 2023) (observing

that "an employment discrimination plaintiff cannot survive summary judgment where the evidence he produces permits nothing more than a speculative basis for believing discrimination was a motivating factor"). And Wilderson's argument also fails for a more fundamental reason: "[E]vidence of the subjective beliefs of individuals who played no role" in the termination decision do not "bear[] on the credibility" of an employer's stated reasons for termination. *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1310 (10th Cir. 2017). Wilderson has not put forth evidence demonstrating either that Burkett was a decisionmaker in her termination or that decisionmakers were influenced by Burkett's ultimatum. Ultimately, Wilderson fails to show how Burkett's ultimatum undermines UKHA's stated reasons for her termination.

For her third point, Wilderson argues both that she was replaced by Ridenour, a younger employee, and that Ridenour was not disciplined for the same conduct. Doc. 53 at 39. But Wilderson was not replaced by Ridenour. *See* Part II.A.1., *supra.* And UKHA's treatment of Ridenour is not relevant because Ridenour was not similarly situated to Wilderson. Doc. 53 at 38–39. Ridenour was still in training and accompanied Wilderson to lunch because, as her trainee, she "follow[ed] [Wilderson] around." Doc. 53 at ¶ 71. Wilderson was an employee of 20 years, Doc. 49-2 at 80, while Ridenour had been at UKHA for a few weeks, Doc. 53 at ¶ 30. Wilderson has adduced no evidence that the two were "subject to the same standards governing performance evaluation and discipline." *Riggs*, 497 F.3d at 1117. Nor has she shown that Ridenour violated work rules of comparable seriousness. Wilderson had a history of behavioral issues and was on her "Final Written Warning" at the time of these incidents. Doc. 53 at ¶ 20; Doc. 49-2 at 73–76. Ridenour had not previously received any corrective action and was reprimanded through verbal counseling following the first lunch event. Doc. 57-6 at 3. Wilderson's violation of the rules was necessarily more serious than Ridenour's. Moreover, Ridenour responded to Burkett's request to stagger lunches saying that she "would be happy to comply," whereas Wilderson's response was perceived by all as "confrontational and aggressive." Doc. 49-4 at 19. Given these differences, no reasonable jury could find that Ridenour and Wilderson were similarly situated. *Roberts v. Int'l Bus. Machs. Corp.*, 733 F.3d 1306, 1310 (10th Cir. 2013) ("It falls on the employee alleging discrimination to rule out alternative explanations for the differential treatment.") (citation omitted).

Fourth, Wilderson argues that "UKHA employees live in fear of being the next in line to suffer the 'KU Way.'" Doc. 53 at 39. This KU Way allegation—that UKHA routinely replaces older nurses who have reached their salary cap with younger, cheaper nurses—might undercut

UKHA's reason for terminating her if Wilderson had raised a genuine dispute of fact that this practice exists. But Wilderson was replaced by an older nurse. *Id.* at ¶ 113; Doc. 57 at 10. If the KU Way exists as Wilderson alleges, she was apparently not subjected to it. And Wilderson identified only one other employee, Kizzy Allen, who was familiar with such a concept. Doc. 53-6. And Allen's testimony suggests that the "KU Way" is nothing more than a hodgepodge of employee complaints, Doc. 53-6 at 10–11, rather than a discriminatory practice that renders UKHA's legitimate business reason unworthy of belief. Allen testified that it was "hard to describe the KU [W]ay," and "it really could be so many different things," *Id.* Moreover, Allen, a 45-year-old nurse, was not terminated. Doc. 53 at ¶ 139; Doc. 53-6 at 2. Allen appears to have voluntarily transferred to a different position within UKHA "a couple of years" after she had reached her salary cap. Doc. 53-6 at 9. Even crediting Wilderson's and Allen's testimony, Wilderson's "KU Way" argument is insufficient to create a question of fact about UKHA's motivation for Wilderson's termination because it is no more than speculation and unsupported inuendo. *Markley*, 59 F.4th at 1083.

Finally, the subjective nature of UKHA's rationale for Wilderson's termination does not create a genuine issue of material fact. *Contra* Doc. 53 at 38. "[T]here is a level of subjectivity inherent in any evaluation process," and the presence of subjective criteria alone does not satisfy a plaintiff's burden to demonstrate pretext. *Riggs*, 497 F.3d at 1120. This was not a decision involving a single, purely subjective evaluation, as it was in the case on which Wilderson relies. Doc. 53 at 38 n.17 (citing *Green v. Sears, Roebuck & Co.*, 434 F. Supp. 2d 1025, 1034 (D. Colo. 2006)). Rather, the termination decision here was based on co-workers citing the same issues over years. *See* Doc. 49-2 at 78–79. That corroboration undermines instead of supports Wilderson's contention that UKHA's proffered reason is inconsistent and entirely unbelievable. *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1039 (10th Cir. 2011). UKHA is entitled to summary judgment on Wilderson's age discrimination claim because she fails to state a prima facie case and does not raise a genuine dispute of material fact that UKHA's proffered reason is unworthy of belief.

## B

UKHA challenges Wilderson's prima facie showing and pretext argument relative to her retaliation claim. Doc. 49 at 27, 33; Doc. 57 at 11, 12. That claim fails for similar reasons.

**1.** *McDonnell Douglas* again provides the relevant framework for Wilderson's ADEA retaliation claim. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012). To establish a prima facie case of retaliation, a plaintiff must show that (i) he or she engaged in protected opposition to discrimination, (ii) he or she suffered a materially adverse employment action, and (iii) there is a causal connection between the protected activity and the adverse action. *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008). The third element requires the plaintiff to show that the employer was "motivated . . . by a desire to retaliate" for the protected activity. *Id.*

Wilderson argues that she can establish a prima facie case of retaliation under three theories. Each is unavailing.

*First*, she argues that her complaints to co-workers about UKHA's practice of replacing older nurses was protected opposition. Doc. 53 at 40. That assertion fails for a couple of reasons. For one thing, Wilderson has identified no evidence that UKHA was aware of these comments. Instead, they were merely complaints among her co-workers. "[T]o qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by the ADEA." *Hinds*, 523 F.3d at 1203. This lack of evidence that Wilderson expressed a concern to her employer defeats her claim. *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) ("An employer's action against an employee cannot be because of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition."); *White v. CertainTeed Corp.*, No. 17-2262, 2019 WL 2085671, at *19–20 (D. Kan. May 13, 2019) (finding the employee's talking to other hourly employees about discrimination did not qualify as protected activity because those communications did not convey his opposition to his employer).

For another, there is no evidence of a causal connection between those complaints and any adverse action, such as her termination. "To establish a causal connection, a plaintiff must 'present evidence of circumstances that justify an inference of retaliatory motive.'" *Bekkem v. Wilkie*, 915 F.3d 1258, 1271 (10th Cir. 2019) (quoting *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014)). Wilderson has offered nothing more than unsupported speculation that UKHA knew about and retaliated against Wilderson for these comments. That is not enough. *Ward*, 772 F.3d at 1203 (observing that a prima facie case of retaliation requires more than "speculation, conjecture, or surmise"); *Hinds*, 523 F.3d at 1203 (noting as a prerequisite to causation, a plaintiff must show that "those who decided to fire [her] had knowledge of [her] protected activity").

*Second*, Wilderson contends that she engaged in protected opposition of age discrimination by filing a grievance. Doc. 53 at 40. UKHA does not dispute that the grievance was filed and that, as a result, it was aware of her complaint, but it points to the obvious timing problem: her single complaint of age discrimination occurred only *after* UKHA terminated her. Doc. 49 at 27–30; Doc. 57 at 11–12. The requisite causal connection is lacking. Because the protected activity (the grievance) came after the adverse action (her termination), the protected activity could not have caused or led to the adverse action. *Eke v. CaridianBCT, Inc.*, 490 F. App'x 156, 161 (10th Cir. 2012) (holding that the employee failed to establish a causal connection as she was terminated before she complained of discrimination); *Harp v. Dep't of Hum. Servs., Colo. Mental Health Inst. at Pueblo*, 932 F. Supp. 2d 1217, 1230 (D. Colo. 2013) (same).

Wilderson alleges that her termination was not effective until after the grievance process. Doc. 53 at ¶ 87. Thus, there is a causal connection between her grievance and her subsequent, actual termination. *See id.* But that argument is without merit. *See Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 517 (10th Cir. 2015) (observing that the employer's post-termination independent review process is separate from the adverse action, *i.e.*, the termination). Wilderson did not work at UKHA during the grievance process and did not receive a paycheck. Doc. 53 at ¶ 87. She cites no law in support of her position that she was still employed by UKHA during the grievance process. *See* Doc. 53 at 39–40. Had she not filed the grievance, she still would have been terminated.

Likewise, no reasonable jury could find that UKHA's decision to affirm Wilderson's termination constituted an adverse action. For an action to be adverse, it must cause more than "a 'de minimis impact' upon an employee's job opportunities or status." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011). An employer's "actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1172 (10th Cir. 2018) (quoting *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). Wilderson was not dissuaded from making allegations of discrimination because she had already been terminated. And, as UKHA notes, its decision to uphold the termination made her no worse off—she did not suffer "any serious injury" as a result of the decision to uphold her termination. Doc. 49 at 29 (citing *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087). The termination itself—not the decision to uphold it—is what caused the "significant change in employment status," constituting adverse action. *Brown v. Austin*, 13 F.4th 1079, 1090 (10th Cir. 2021); *see also Meiners v. Univ. of Kan.*, 239 F. Supp. 2d 1175, 1192

(D. Kan. 2002) (observing that refusal to reconsider an earlier employ-
ment decision "would be a normal incident" of the prior decision ra-
ther than "a separate adverse employment action").

*Third*, Wilderson has failed to establish a prima facie case relative
to UKHA's instruction of current employees not to communicate with
her following her termination. Doc. 47 at 5; Doc. 53 at 40. Her argu-
ments on the issue are sparse and without any citation to supporting
authority. Doc. 53 at 39–40. Assuming UKHA instructed its employ-
ees to this effect, Doc. 49-6 at 14, and that it did so in retaliation for
making an age-related complaint in her request for review of the ter-
mination decision, Wilderson has not explained or demonstrated how
that "constitute[s] a significant change in employment status," *C.R.
England*, 644 F.3d 1040, or would have "dissuaded a reasonable worker
from making or supporting a charge of discrimination," *Somoza v. Univ.
of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008) (quoting *Burlington N.
& Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Jones v. Wichita State
Univ.*, 528 F. Supp. 2d 1182, 1193 (D. Kan. 2007) (holding "cold shoul-
der treatment" not materially adverse as a matter of law). Wilderson's
prima facie case fails for lack of evidence of a causal connection be-
tween protected opposition and adverse employment action.

**2.** Even assuming that Wilderson had alleged a prima facie case of
retaliation, her claim still fails. UKHA has satisfied its burden of estab-
lishing a legitimate nondiscriminatory reason for its termination deci-
sion. *See* Part II.A.2., *supra*. That, again, shifts the burden back to Wil-
derson to show that the reason for terminating her is merely pretextual.
To prove pretext, a plaintiff must produce evidence which indicates
that the employer "didn't really believe its proffered reasons for action
and thus may have been pursuing a hidden discriminatory agenda."
*Johnson v. Weld Cnty.*, 594 F.3d 1202, 1211 (10th Cir. 2010). Wilderson,
however, provides no argument for or evidence of pretext or retalia-
tion apart from her grievance from UKHA's termination that was up-
held. Doc. 53 at 39–40; *see also* Part II.A., *supra*. Wilderson's failure to
allege pretext precludes her claim. *See Swackhammer v. Sprint/United
Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) ("[If] the employer has
successfully articulated a legitimate, nondiscriminatory reason for ter-
mination . . . the presumption of discrimination created by the plain-
tiff's prima facie case 'simply drops out of the picture' and '[t]he plain-
tiff then carries the full burden of persuasion to show that the defend-
ant discriminated on [an] illegal basis . . . .'").

### III

For the reasons set forth above, UKHA's motion for summary judgment, Doc. 48, is GRANTED.

It is so ordered.

Date: June 7, 2023                          _s/ Toby Crouse_____
                                             Toby Crouse
                                             United States District Judge